IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

IN RE:

POTOMAC CONSTRUCTION
INDUSTRIES, INC., *et al.*

Debtors.

Case No. _____

Chapter 11

Joint Administration Requested

## AFFIDAVIT OF GREGORY E. KENNEDY, EXECUTIVE VICE PRESIDENT OF POTOMAC CONSTRUCTION INDUSTRIES, INC., IN SUPPORT OF FIRST DAY MOTIONS

I, Gregory E. Kennedy, in support of the First Day Motions, after first being duly sworn, declare that if called to testify in this case I could and would testify as follows: I am the General Counsel and Executive Vice President of Potomac Construction Industries, Inc. ("**PCI**") and, as such, am familiar with the operations, assets, and liabilities of its affiliates Potomac Construction Leasing, LLC ("**PCL**") and Potomac Construction Equities, LLC ("**PCE**") (each a "**Debtor**" and together with PCI, the "**Debtors**").

1. In my capacity with the Debtors, I am and have been actively involved in the Debtors' efforts to restructure their businesses and finances with the assistance of the Debtors' employees and its counsel. I have general knowledge of the Debtors' respective books and records, and I am familiar with each of the Debtors' financial and operational affairs.

2. I submit this affidavit (the "**Affidavit**") in support of the motions and applications filed by the Debtors contemporaneously with this Affidavit (collectively, the "**First Day Motions**"). Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents, other information prepared or collected by the Debtors' employees, or my opinion based on my

1

experience with the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately reading, preparing, or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

3. Based upon my personal knowledge and through my review of the Debtors' books, records, and other information, I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to continue to operate as debtor-in-possession, and that the failure to grant such relief would have a deleterious effect upon the Debtors' operations, their ability to administer the estates, the ability to reorganize Debtor's business effectively, and the ability to preserve the Debtors' intrinsic value as going concerns in the event of a sale of assets.

4. This Affidavit describes the Debtors, their businesses, and the events leading to the filing of this case. In addition, this Affidavit sets forth relevant facts in support of the First Day Motions. Capitalized terms not otherwise defined herein bear the meanings ascribed to them in the respective First Day Motions.

## Background

5. On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6. Since the Petition Date, the Debtors have continued in possession of their property and are operating and managing their property as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

A. The Debtors

7. Potomac Construction Industries, Inc., was formed in Martinsburg, West Virginia in 1938. Originally, the company's operations included excavation, asphalt production, asphalt placement, and the manufacture of ready-mixed concrete. In 1992, John F. Abbruzzese purchased the company, pared the unprofitable excavation operations, and refocused the company's efforts on asphalt and ready-mixed concrete manufacturing. Throughout the remainder of the 1990's, the production of asphalt and asphalt placement continued to generate the bulk of the company's revenues.

8. By the year 2000, the suburbanization of the eastern panhandle of West Virginia, the increase in federally funded projects, and the increase in industrial and commercial projects gave way to a significant increase in the company's manufacture of ready-mixed concrete. This was fueled in part by an extremely robust housing market. By 2002, the production of ready-mixed concrete began to generate the bulk of the company's revenue.

9. In 2003, the company expanded its ready-mixed concrete operations by purchasing from a competitor a plant located in Jefferson County, West Virginia. Adding this production capacity allowed the company to increase its production and sales of ready-mixed concrete. Moreover, the company grew its asphalt production and asphalt placement operations, which in large part benefited from the creation of new residential subdivisions and the associated roadwork. By the end of 2005, the company increased its sales to $18 million and the number of its employees to 82.

10. In an effort to keep pace with the housing boom and overall increase in demand for ready-mixed concrete, as well as a desire to expand into new markets, the company expanded again in 2007. It constructed a new ready-mixed concrete production plant in

Pinesburg, Maryland. Building the plant augmented the existing customer base in Berkeley County, West Virginia, and permitted the company to penetrate the Hagerstown, Maryland markets. The company also entered into several leases for equipment in order to keep pace with its expanding operations.

11. In late 2007, the housing market softened, and the demand for ready-mixed concrete weakened accordingly. Additionally, volatility in the price of liquid asphalt—the key component for the manufacture of hot mix asphalt—reached unprecedented levels. This created an environment in which many jobs were abandoned and many more were re-bid. Ultimately, this produced a significant decline in profit margins for asphalt.

12. The company dealt with the decreased demand for both ready-mixed concrete and asphalt throughout 2008. The resulting decrease in sales and profits changed the company's relationship with its senior lender. Specifically, the lender downgraded the company's borrowing status and presented the company with an agreement to work out its loans. This agreement has been amended five times, with each modification constructing progressively more severe impediments to the company's viability.

13. At the start of the market downturn, the company implemented measures to reduce its fixed costs. Moreover, the company began to evaluate underperforming assets and sold such assets as necessary. Notably, the company sold its asphalt division in August 2009, along with various pieces of equipment, rolling stock, and vehicles. The sole beneficiary of these cost-cutting efforts was the company's senior lender. The lender has received the major portion of all sale proceeds and has required the company's principals to pledge additional, personal assets to collateralize company loans. Nevertheless, the company's lender froze its

line of credit in 2008, and it has remained frozen since that time. These factors have created a tenuous operating environment for the company.

14. The net effect of the relationship between the company and its senior lender is that the company's principals have committed over $3 million of their personal assets to fund operations through the recent winter. Additionally, the market has been hampered by unseasonably wet weather, along with continued downward pressure. Thus, the company's cash flow impairment, the inability of company principals to make further investment, and the lack of workable solutions from the company's senior lender on a functioning line of credit have crippled company operations.

15. Despite these difficulties, the company has a bright future. It has work in progress and committed work that will produce or result in sales that will sustain the company's viability. Nevertheless, the Debtors believe they will be unable to continue operations without chapter 11 reorganization. Although the Debtors are willing to explore all options for the benefit of its various constituencies and in the exercise of reasonable business judgment, at this time the Debtors feel that a sale of their assets will provide the most benefit to secured as well as unsecured creditors. Accordingly, the Debtors are negotiating a sale of their assets. Nevertheless, in order to preserve the Debtors' going concern value and thereby obtain the best result for unsecured creditors, the Debtors must continue to operate under the protection of chapter 11.

### First Day Motions and Application

I. Legal Professionals' Applications and Related Motions

    A. Application of Debtor and Debtor-in-Possession for an Order Authorizing the Retention and Employment of McNeer, Highland, McMunn & Varner, L.C. as Co-counsel for the Debtor (the "Co-Counsel Application")

16. The Debtors also need legal counsel with specific knowledge of West Virginia law in areas outside the direct expertise of its bankruptcy counsel, Magee Goldstein Lasky & Sayers, P.C. McNeer, Highland, McMunn & Varner, L.C. ("**McNeer**") has extensive experience in insolvency and bankruptcy matters in West Virginia. Moreover, McNeer represented the Debtors prior to the Petition Date. As a result, McNeer has developed institutional knowledge of the Debtors' businesses and operations, as well as their financial difficulties. McNeer's attorneys are best situated to assist the Debtors in matters that may arise in this case and that fall outside the expertise of the Debtors' lead bankruptcy counsel.

17. If the Debtors are forced to retain new counsel, they will have to pay the new counsel to obtain the information that McNeer's attorneys already possess. Additionally, the Debtors' employees would have to assist new counsel in obtaining that information, thereby straining the abilities of the employees to respond promptly to requests from the Debtors' bankruptcy counsel. This would waste time, energy, and effort, thereby harming the Debtors and their estates and creditors.

18. Prior to the Petition Date, the Debtors paid McNeer all fees and expenses owed to McNeer in the ordinary course of business.

    B.    <u>Application of Debtor and Debtor-in-Possession for an Order Authorizing the Retention and Employment of Magee Goldstein Lasky & Sayers, P.C. as counsel (the "Counsel Application").</u>

19. The Debtors' chapter 11 cases require counsel with extensive experience in insolvency and bankruptcy cases, as well as conveyances of assets inside bankruptcy. The Debtors chose Magee Goldstein Lasky & Sayers, P.C. ("**MGLS**") as their bankruptcy counsel and desire to retain MGLS as their attorneys. MGLS is a law firm with extensive insolvency and bankruptcy expertise and that has competently handled many bankruptcy cases.

20. Shortly before the Petition Date, MGLS advised the Debtors regarding options to handle their financial difficulties, including bankruptcy reorganization and non-judicial restructuring. As a result, MGLS obtained valuable institutional and specific knowledge of the facts and law pertinent to the resolution of this case. It would impose a serious financial hardship on the Debtors to pay another law firm to acquire the knowledge of the law and facts of the case already obtained by MGLS. MGLS is well qualified and able to represent the Debtors in these cases and, accordingly, this Court should approve the Counsel Application.

21. Prior to the Petition Date, the Debtor paid MGLS all fees and expenses owed to MGLS in the ordinary course of business.

II. First Day Administrative Motions

    A. Emergency Motion of the Debtor for Entry of an Order Approving Notice of Evidentiary Hearing on Certain First Day Motions and Applications ("First Day Motions")

22. The Debtors' abilities to operate will be irreparably harmed unless expedited hearings are held on the First Day Motions. The First Day Motions seek relief necessary to enable the Debtors to continue to operate until such further notice as the Court may require can be given, if any. For example, under § 366(c) of the Bankruptcy Code, utility companies can terminate service unless adequate assurance of payment is negotiated and provided to the utility companies within thirty days of a debtor's petition date. If the Debtors are not authorized to retain counsel in sufficient time to negotiate with utility companies, the Debtors risk having any motion filed pursuant to § 366 of the Bankruptcy Code dismissed. Additionally, the relief requested in the First Day Motions is the product of the Debtors' exercise of sound business judgment.

23. It is my understanding that the relief requested by the Debtors is consistent with the relief routinely granted in other chapter 11 bankruptcy cases.

> B. <u>Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")</u>

24. Each of the Debtors is an "affiliate" of the others as that term is used in the Bankruptcy Code. Additionally, most of the issues that affect one debtor (i.e., PCI) will affect the other debtors similarly. Accordingly, the Debtors submit that joint administration of the Debtors' related bankruptcy proceedings will save time and preserve estate assets. Entry of the order attached to the Joint Administration Motion is therefore appropriate.

> C. <u>Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(b)(9) and Federal Rule of Bankruptcy Procedure 3003(c)(3) Establishing Bar Date for Filing Proofs of Claim and Approving Bar Date Notice ("Bar Date Motion")</u>

25. An order establishing a bar date (the "**Bar Date**") for the filing of proofs of claim and approving the form of notice of the Bar Date is critical to enable the efficient administration of the Debtors' estates. Because the company intends to negotiate a sale of its assets while exploring all available options, it is important that the Debtors and potential purchasers become aware of all claims affecting the value of the Debtors' business as a going concern as early as possible in the cases. Granting the Bar Date Motion will enable the Debtors, their counsel, and potential purchasers to understand the Debtors' intrinsic value on an expedited basis, which, in turn, will inure to the benefit of all creditors. I believe that the relief requested in the Bar Date Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. Therefore, the relief requested in the Bar Date Motion should be granted.

D. Motion of the Debtor for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals ("Interim Compensation Motion")

26. The Debtors seek the establishment of procedures for compensating and reimbursing professionals approved by this Court on a ninety (90) day basis, which procedures are comparable to the procedures established in other chapter 11 cases in this district. Such an Order will streamline the professional compensation process and enable the Court, creditors, the United States Trustee, and other parties in interest to monitor the professional fees incurred in this case most effectively. Further, the proposed procedures will avoid forcing the professionals approved by this Court to finance the Debtors' bankruptcy cases while awaiting final approval of fees and expenses. The Debtors also requests that the Court limit the notice of hearings to consider interim and final compensation and reimbursement of expense applications to the Notice Parties and any parties requesting notice pursuant to Bankruptcy Rule 2002. Such notice procedures will preserve the Debtors' estates' assets and is in the best interest of the Debtor, its estate, and its creditors, and other parties in interest. Therefore, the relief requested by the Interim Compensation Motion is appropriate and should be approved by this Court.

III. First Day Motions Pertaining to Operations

A. Motion of the Debtors for Entry of an Order Under § 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")

27. Unless the Debtors' utility companies are adequately protected, they may discontinue service to the Debtors. The Debtors manufacture concrete, which requires a substantial supply of energy and resources to produce. Moreover, the materials the Debtors supply may be readily available from competitors. The sudden interruption of utility service

would negatively impact the Debtors' abilities to provide materials to its customers, thereby diminishing the Debtors' value as a going concern.

28. The Court should prevent any disruption in service because the Debtors have offered to give their Utility Providers adequate assurance of payment, as specifically required by the Bankruptcy Code. The Utilities Motion provides for adequate procedures to protect any Utility Provider that disputes the adequacy of the Debtors' proposed assurance. The procedures set forth in the Utilities Motion will also help conserve the Debtors' resources and thereby assist in successful prosecution of these cases.

29. Moreover, the Debtors do not have the administrative staff to negotiate with each of its Utility Providers independently. Such a process would also be impracticable, because, typically, the Utility Providers' customer service representatives are unable to negotiate adequate protection terms for the Utility Providers. Responsibility for that process falls to the Utility Providers' lawyers, who will not have become aware of the Debtors' situation until the Petition Date. The Debtors aver that such a process would create an undue burden on the Debtors and force the Debtors to incur unnecessary and burdensome administrative expenses.

30. For all of the foregoing reasons, the Debtors request the entry of the proposed order attached to the Utilities Motion.

    B. <u>Debtor's Emergency Motion Pursuant to Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code for an Order Authorizing, but not Requiring, the Payment of Prepetition Claims of Critical Trade Vendors ("Critical Vendors Motion")</u>

31. The Debtors seek entry of an order authorizing them, in the reasonable exercise of their business judgment and in their sole discretion, to pay for goods or services ordered and/or delivered or performed prepetition, or to pay a portion of such claims. Payment of the Critical Vendor Claims will significantly enhance the Debtors' uninterrupted performance under their

current business contracts and any future business contracts, which are an integral part of the Debtors' business operations. Payment of Critical Vendor Claims is vital to the Debtors' reorganization efforts because the Critical Vendors (i) are the sole source from which the Debtors can procure certain goods or services, and/or (ii) principally consist of vendors who lack incentive to continue providing such services or producing the goods absent payment from the Debtors. If the Debtors lose their relationships with the Critical Vendors or the Critical Vendors refuse or are unable to continue in operation as a consequence of the Debtors' failure to pay prepetition amounts, the loss of such specialized services and goods would risk bringing a substantial portion of the Debtors' business and operations to a standstill, substantially and irreparably frustrating the Debtors' ability to generate current and future revenue. This, in turn, would reduce the Debtors' value as a going concern, which would damage creditors generally.

32. Accordingly, the Debtors request the authority, but not the obligation, to pay the prepetition claims (or a portion thereof) of the Critical Vendors subject to the terms in the Critical Vendor Motion.

    C. <u>Motion for an Order Authorizing the Debtor's Use of Cash Collateral ("Cash Collateral Motion")</u>

33. Prior to the Petition Date, the Debtors borrowed money from Branch Banking & Trust Company ("**BB&T**"), and this indebtedness is secured by nearly all the Debtors' assets, including deposit accounts, accounts receivable, inventory, and other cash collateral. Much of this collateral and its proceeds constitute "cash collateral" as that term is defined in § 363 of the Bankruptcy Code. In order to continue to pay vendors, meet its payroll and benefit obligations to its employees, satisfy deposit and payment obligations to utilities and other providers, maintain in effect its insurance policies, preserve and protect its assets, and generally to pay obligations critical to the continuing obligation of the business, the Debtors require the use of this cash collateral.

34. The Debtors intend to provide adequate protection to BB&T through a replacement lien on post-petition cash collateral, including deposit accounts, inventory, and accounts receivable. If the Debtors are unable to obtain this cash collateral, the Debtors will not be able to operate their business effectively postpetition, thereby forfeiting much of their value as a going concern. This would damage unsecured creditors substantially.

35. For all of the foregoing reasons, the Debtors request entry of the proposed order attached to the Cash Collateral Motion.

   D. <u>Motion of the Debtors for Entry of an Order Authorizing the Debtors to (a) Continue Prepetition Insurance Policies, (b) Continue Prepetition Insurance Programs, and (c) Obtain New Insurance Policies (the "Insurance Motion")</u>

36. In connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain a comprehensive insurance program that provides them with coverage for, *inter alia*, commercial general liability, excess liability, worker's compensation, automotive liability, crime, employee dishonesty, fiduciary liability, terrorism, legal property loss, tools, equipment, personal property, medical expenses, computer media/EDP business interruption, and personal and advertising (collectively, the "**Insurance Coverage**").

37. Continuation of the Insurance Coverage during the chapter 11 cases is essential to the preservation of the Debtors' business, property, and assets, and in many cases such coverage is required by various regulations, laws, and contracts that govern the Debtors' business conduct. Additionally, debtors in chapter 11 cases have fiduciary obligations and a legal duty with respect to protection of their business operations, which in part is met by maintaining insurance coverage during the pendency of their chapter 11 cases.

38. As of the Petition Date, the Debtors may be in default for premiums, fees, or taxes due in connection with the Insurance Coverage. Although the Debtors do not believe that they

require Court approval to maintain their existing Insurance Coverage, out of an abundance of caution the Debtors seek entry of an order authorizing but not requiring them to pay prepetition premiums, taxes, and fees that are necessary to maintain the Insurance Coverage presently in effect. Additionally, the Debtors seek authorization to revise, supplement, or change their Insurance Coverage and make required postpetition payments as needed during the pendency of these cases in accordance with the Debtors' fiduciary obligations and their reasonable business judgment.

39. Because maintaining the Insurance Coverage will help to preserve the Debtors' estates for the benefit of all constituencies, the Debtors request entry of the order attached to the Insurance Motion.

> E. Application of the Debtors and Debtors in Possession for an Order Authorizing the Retention and Employment of John F. Abbruzzese as Chairman and Chief Executive Officer, Michael J. Abbruzzese as President, Gregory E. Kennedy as General Counsel and Executive Vice President, Joanna Abbruzzese as Chief Financial Officer, and Barbara H. Pichot as Controller ("Key Personnel Motion")

40. The Debtors' management team consists of John Abbruzzese, Michael Abbruzzese, Joanna Abbruzzese, Gregory Kennedy, and Barbara Pichot (collectively, the "**Key Personnel**"). Each of these individuals has intimate familiarity with the Debtors' businesses and/or relationships with various of the Debtors' creditors and parties who may be interested in purchasing the Debtors' assets. The Debtors believe that retaining the Key Personnel will be in the best interest of the Debtors' creditors and other parties in interest because of the Key Personnel's knowledge of the Debtors' operations and financial condition. Preserving the Key Personnel to manage the Debtors through the Bankruptcy Case avoids inefficiencies inherent in retaining new officers and directors and allowing new individuals to acquaint themselves with the Debtors' operations. Moreover, the Debtors believe that the Key Personnel have the necessary background, history,

and relationships with customers, vendors, and others to deal with the business issues that will arise in the context of the Bankruptcy Case and can assist the Debtors' counsel in negotiating with creditors and other constituencies, thereby preserving the most value for unsecured creditors.

41. Each of the Key Personnel has stated his or her desire and willingness to act in accordance with the Debtors' obligations as debtors in possession in the Bankruptcy Case and to use his or her best efforts to keep the company operating through confirmation and implementation of the plan. For these reasons, the Debtors submit that the Court should enter the order attached to the Key Personnel Motion.

    F.    <u>Motion for Entry of an Order Authorizing Payment of Pre-Petition Wages, Salaries, and other Compensation and Costs and Expenses Incident Thereto ("Pre-Petition Wages Motion")</u>

42. As of the Petition Date, all of the Debtors' current salaried and hourly employees were owed or had accrued various sums for wages, salaries, contractual compensation, and other accrued compensation. The Debtors need to continue to operate to maximize the recovery for their creditors. The Debtors' employees will not continue to work for the Debtors while they reorganize or liquidate the business if they are not paid their prepetition wages. The Debtors' employees are necessary to the continued operation of the company. Accordingly, the Debtors request authorization to pay the pre-petition wages, salaries, contractual compensation, and other accrued compensation in the ordinary course of the Debtors' business.

IV.    <u>Injunctive Relief</u>

    A.    <u>Complaint to Extend the Automatic Stay, or, In the Alternative for Injunctive Relief to Enjoin Creditors from Pursuing Claims Against Guarantors ("Injunction")</u>

43. John Abbruzzese, Michael Abbruzzese, and Joanna Abbruzzese (the "Guarantors") intend to assist the reorganization and restructuring of the Debtors by

continuing to serve in their capacities as directors and officers of the Debtors. As the relationship points for potential purchasers, their contribution to the bankruptcy proceedings will be substantial. However if the Guarantors are forced to defend personal guarantees while the bankruptcy proceedings are ongoing, they will likely be unable to assist in the reorganization or liquidation.

44. The Guarantors will be forced to expend significant time and resources responding to actions against their assets, which actions will undoubtedly prove to be time-consuming and distracting. Accordingly, permitting those actions to proceed would undermine the purpose of the automatic stay and prove destructive to creditor recoveries.

45. Through its complaint and related motions practice, the Debtors seek a declaratory judgment from the Court extending the automatic stay of §§ 362(a)(1) and (3) to the Guarantors to stay the efforts of creditors from enforcing their guarantees. In the alternative, the Debtors ask the Court to use its equitable powers under § 105 of the Bankruptcy Code to issue an injunction preventing the enforcement of creditors' guarantees against the Guarantors on the grounds that participation in these bankruptcy proceedings by the Guarantors is vital.

46. For all the foregoing reasons, the Debtors request a declaratory judgment extending the automatic stay to the Guarantors or, in the alternative, an injunction preventing the enforcement of the Guarantors by their creditors.

Further the affiant says not.

                                      Gregory E. Kennedy, as Executive Vice President of Potomac Construction Industries, Inc.

STATE OF WEST VIRGINIA    )
CITY/COUNTY OF Berkeley    )

I, Rose M Martin, a Notary Public, do hereby certify that Gregory E. Kennedy personally came and attested to the foregoing before me this 5/4/2011.

                                        Rose M Martin
                                        Notary Public

My Commission Expires:

April 8, 2012

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROSE M. MARTIN
20 ASTER COURT
MARTINSBURG, WV 25401
My commission expires April 8, 2012

U:\A CLIENTS\Potomac Construction Industries, Inc. 3214\Potomac Construction Industries, Inc. 3214\First Day Motions\Kennedy Affidavit.doc